# EXHIBIT A

Received
JAN 16 2003
Marquist Sparkman, LLP




U.S. POSTAGE PAID
FCM LG ENV
WEST ROXBURY, MA
02132
JAN 12 19
AMOUNT
**$2.89**
R2303S101284-09

1000     97204

DONALD J. HUBBARD
Attorney At Law
46 Stratford Street
Boston, MA 02132

Klaus Hamm, Esq.
Klarquist Sparkman LLC
One World Trade Center
121 S.W. Salmon Street
Suite 1600
Portland, OR  97204

# DONALD J. HUBBARD

ATTORNEY AT LAW

46 STRATFORD STREET, BOSTON, MASSACHUSETTS 02132
TELEPHONE: 617 469 0775    EMAIL: donaldjhubbard@gmail.com

January 11, 2019

Klaus Hamm, Esq.
Klarquist Sparkman LLC
One World Trade Center
121 S.W. Salmon Street
Suite 1600
Portland, OR 97204

RE: National Lumber

Dear Klaus:

Thank you for agreeing to accept service of the enclosed copies of the amended complaint and summons in the above-referenced matter.

I am also sending a copy of the amended complaint out today to Chris Hamilton on behalf of National Lumber. I do not have a return yet on Trask, but in the event they have been served, I am happy to send along a copy of the amended complaint once it is ascertained who will represent it.

Very truly yours,

Donald Hubbard

cc. Christopher Hamilton, Esq.

# Commonwealth of Massachusetts

BRISTOL, SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. _____ 1873CV01162

Intellectual Property Development, Inc. PLAINTIFF(S),

v.

Boise Cascade Engineered Wood
Products, et al _____, DEFENDANT(S)

## SUMMONS

Boise Cascade Engineered Wood Products

THIS SUMMONS IS DIRECTED TO _____. (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the ___Bristol Sup._____ Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

   a. Filing your **signed original** response with the Clerk's Office for Civil Business, ___Bristol Sup.___ Court, _____ (address), by mail or in person, **AND**      9 Court Street. Taunton. MA 02780

   b. Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: _____ Donald Hubbard, Esq. 46 Stratford St., Boston, MA 02132

3. **What to include in your response.** An **"Answer"** is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov.courts/case-legal-res/rules of court.

4.   **Legal Assistance.** You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.   **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on _____January 11_____, 20_19_. (SEAL)

Marc J. Santos
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____January 11_____, 20_19_, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4 (d)(1-5)):

By mailing amended complaint and summons to Attorney Klaus Hamm at his office address pursuant to his acceptance of service of same, as set forth in his attached email.

Dated: ___January 11___, 20_19_   Signature: _____

N.B.   **TO PROCESS SERVER:**

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX – BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

< 474 Results for **hamm**

**IPD v. Boise Cascade et al**

**From:** Klaus H. Hamm <klaus.hamm@klarquist.com>
**To:** Deejhub <deejhub@aol.com>
**Cc:** Kirk Teska <kirk@itclaw.com>; 'Christopher P. Hamilton (CHamilton@hamiltonlawpartners.com)' <CHamilton@hamiltonlawpartners.com>; Carrie A. Fry <carrie.fry@klarquist.com>
**Date:** Wed, Jan 9, 2019 2:26 pm

Don,

This email confirms our agreement that I will accept service by email of the complaint in *Intellectual Property Development v. Boise Cascade Wood Engineered Wood Products, et al.*, 1873CV01162, on behalf Boise Cascade, and that in exchange you agree that Boise Cascade has an additional 21 days to file a responsive pleading. Please email us the complaint.

You informed me that it is not necessary to file anything with the court regarding the 21-day extension for the responsive pleading, but we assume that should a filing be necessary that you will fully cooperate. Our agreement to accept service via email is expressly conditioned on such cooperation should it be necessary.

Regards,
Klaus

COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.

Superior Court
C.A. No. 1873CV01162

Intellectual Property Development,  )
Inc.,                               )
      Plaintiff                   )
v.                                  )
                            )
Boise Cascade Engineered Wood       )
Products, Warren Trask Company,     )
Inc., National Lumber Company,      )
Evanston Insurance Company,         )
One Unnamed Gluing Machine          )
Manufacturer, One Supplier of       )
Adhesives and One Supplier of       )
Liners,                             )
      Defendants                  )

AMENDED COMPLAINT

1.     The Plaintiff, Intellectual Property Development, Inc. ("IPD") is an Idaho General

Business Corporation filed on July 20, 2017, with a principal place of business in

Coronado, California.  It maintains substantial business contacts in the Commonwealth.

2.     . The Defendant, Boise Cascade Engineered Wood Products ("Boise Cascade") is

a foreign corporation registered to do business in the Commonwealth with its

headquarters at 1111 West Jefferson Street, Boise, ID.  It maintains substantial business

contacts in the Commonwealth.

3.     The Defendant, Warren Trask Company, Inc. ("Trask") is a corporation registered

to do business in the Commonwealth of Massachusetts with its headquarters and principal

place of business at 63B Bedford Street in Lakeville, Plymouth, County, Commonwealth

of Massachusetts.

4.     The Defendant, National Lumber Company ("National Lumber") is a

corporation registered to do business in the Commonwealth with its headquarters at 71 Maple Street, Mansfield, Bristol County, Commonwealth of Massachusetts.

5.      The Defendant, Evanston Insurance Company ("Evanston"), is an insurance company with a principal place of business located at 10 Parkway N. Deerfield, Illinois, which insures National Lumber and otherwise conducts substantial business in the Commonwealth of Massachusetts.

6.      The Defendant, One Manufacturer of a Gluing Machine is a person or company which duplicated the gluing machine of Plaintiff and/or PAS and/or Glenn Robell without authority and sold it to National Lumber for use in National Lumber's Branford, CT facility. The President of National Lumber refused to identify at his deposition, the name of this manufacturer, but once that name is obtained, Plaintiff reserves the right to further amend this complaint to add the correct party name and address.

7.      The Defendant, One Supplier of Adhesives is a person or company which produced and sold adhesives without authority to National Lumber for use in National Lumber's Massachusetts' facility and/or Branford, CT facility. National Lumber did identify the name of a supplier, to wit, Adhesives Specialists, Inc., but Adhesives Specialists, Inc. may no longer be serving as a supplier; once the name of the current supplier is ascertained/obtained, Plaintiff reserves the right to further amend this complaint to add the correct party name and address.

8.      The Defendant, One Supplier of Liners is a person or company which produced and sold liners without authority to National Lumber for use in National Lumber's Massachusetts' facility and/or Branford, CT facility. National Lumber did identify the name of a supplier, to wit, Rayven, Inc., but Rayven, Inc. may no longer be serving as a

supplier; once the name of the current supplier is ascertained/obtained, Plaintiff reserves the right to further amend this complaint to add the correct party name and address.

9.     Boise Cascade, Trask and National Lumber share, and for several years have shared, a mutually beneficial business relationship with each other, and in terms relevant to this action, National Lumber converted technology from IPD (and continues to use a machine from Pre-Applied Systems, Inc., another company of which Glenn Robell is president, in violation of a 2010 agreement between National Lumber and Pre-Applied Systems, Inc.).

10.     Trask is the wholesaler, the go-between between Boise Cascade and National Lumber, and has been so since at least 2001, as testified to by Manny Pina, president of National Lumber.     Boise Cascade supplies I-joists through Trask, which National Lumber then takes and then converts IPD's Floor-Loc technology, to apply glue to an I-joist with a liner; so that contractors can then peel off the liner and apply the I-joist during construction. In each level of this chain, the Defendants all profit at the expense of IPD.

<u>The Elements of the FloorLoc System</u>

11.     On or about December 15, 2006, Glenn Robell, the president of IPD, filed for a United States Patent for a Method and Improvement to Saw System used for Cutting I-Joints to Size (Appl. No. 11/640.020):

> a.  Subsequently, before this original patent expired, a filing of a U.S. Continuation In Part (C-I-P) patent application #13080633 occurred; U.S. Patent Grant #8,915,280 and Domestic Priority was established between these two U.S. patent applications making U.S. Patent #7,918,960 the 'Parent' of U.S. Patent #8,915,280.  His maintenance payments are up to date.
> b.  The technology was developed to implant adhesives on I-Joists with liners in such a way that when the liner was pulled off, the joist could be immediately glued onto another piece of wood.

12.     In addition to developing a machine to facilitate this process, an adhesive and

liner had to be developed, which Glenn Robell did over the course of almost a year.

As early as May 31, 2006, Bob McNutt, then Vice-President of Boise Business

Solutions Manufacturing LLC, had signed a letter, which Glenn Robell also signed, that

set forth the parameters which drove the relationship between Boise Cascade, then later

National Lumber:

(1)     the relationship was formed around "pre-applied adhesives and equipment useful in connection with application thereof to I-Joists,"

(2)     if a formal licensing agreement is executed, which did occur, it "shall encompass the licensing of all trademarks, patents and copyrights filed by IPD that relate to the   technology,"

(3)     Boise "would hold an exclusive license for the technology from IPD and hold a  regional production agreement with the dealers to permit the dealers to manufacture and sell I-Joists processed through the equipment,"

(4)     "each [Boise] dealer purchasing the equipment would enter into an agreement with [Boise] and IPD permitting the dealer to install, maintain and operate the equipment and sell product processed by the equipment," and

(5)     "IPD will sell the adhesives to either [Boise] or one of its chosen dealers..."

13.     Boise Cascade and IPD entered into a Patent License Agreement dated January 1,

2007, which was amended on September 1, 2007 ("Patent License Agreement").  The

Patent License Agreement defined in relevant part the exclusive patent rights granted to

Boise Cascade, licensee rights to grant sub-licenses to third party dealers and licensee

obligations concerning equipment and supplies:

1.4 Patent Rights
Patent Rights shall mean all rights provided by an issued claim or claims of a patent or
patents issuing from the Applications, and any other U.S. patent or patent application
now or hereafter owned by Licensor covering the subject matter of the Applications,
provided however, Licensee may only use the rights granted under this Patent License
Agreement in connection with engineered wood products manufactured by Licensee
including but not limited to I-Joist, LVL and glue lam beams.  Patent Rights also include
patents which issue as reissues, reexaminations, continuations.

2.2 Sublicensing
Licensor also hereby grants to Licensee the rights to sublicense its rights to third parties
who distribute I Joist manufactured by Licensee. All sublicense's granted by Licensee
shall provide the termination of the sublicense upon termination of this Agreement.

2.5 Equipment and Supplies
Licensee agrees to purchase all adhesives, tape, and equipment from Licensor to exercise
the Patent Rights.

.       Although Boise Cascade and IPD renegotiated with each other over the ensuing

years, these parameters were in place throughout.

Relationship Between Boise Cascade and National Lumber Company

14.     As the exclusive partner and supplier of engineered wood products (hereafter

referred to as "EWP") to National Lumber at all relevant times, Boise Cascade, Like

Trask and National Lumber itself, benefits for every lineal foot of I joist sales that

National Lumber sells.  Additionally, when Boise Cascade invested tech funds in the

initial FloorLoc System and then paid for all the Start Up costs, upon information and

belief it was clear to Boise Cascade that their investment would be returned in the rebate

program structured with National Lumber at the time.

15.     National Lumber has sought to protect a documents that IPD posits substantiates

many of its allegation and while some documents have finally been disclosed to IPD, it is

far from certain that all relevant documents have been produced to IPD by National

Lumber, Boise Cascade and/or Trask.

16.     Despite this, after litigation commenced in Bristol Superior Court in Intellectual

Property Development, Inc. and Pre-Applied Systems, Inc. v. National Lumber

Company, C.A. No. 1773CV00793 (hereafter referred to as the "IPD/PAS action"),

National Lumber made statements that it should have retracted, at the TRO hearing in

September 2017, including but not limited to the following:

(1)     "Even if the National Lumber Company was a 'sub-licensee' to Boise
        Cascade, which it wasn't, either Boise Cascade would have to charge
        National Lumber with a breach or [IPD] would have to charge Boise
        Cascade with a breach."  National Lumber's Opposition to Plaintiffs'
        Motion for TRO/PI at page 8, 1st full paragraph;

(2)     "…the patent in question has expired and is now void. " *Id.* at page 8, 2nd
        full paragraph;

(3)     "…if any royalties due (sic) Intellectual Property Development, Inc., those
        royalties were due by Boise Cascade under the agreement…between
        Intellectual Property   Development, Inc. and Boise Cascade." Id. at page
        8, 4th full paragraph, and

(4)     "On its face, that agreement and any alleged sub-license ended in January
        of 2017 and two years earlier than that due to the expiration of the patent."
        Id. at page 8, 5th paragraph.

17.     Boise Cascade saw added value in IPD's pre-applied adhesive system for their I-

joists. Agents, employees, officers and/or directors of Boise Cascade presented the

System to representatives of National Lumber, who expressed high interest in the

exclusivity to manufacture and sell it.  In this manner, National Lumber ultimately

became a sub-licensee of IPD.

18.     In furtherance of National Lumber's interests, it entered into an agreement with

Pre-Applied Systems (hereafter referred to as "PAS"), another company with Glenn

Robell serving as its President, on or about April 10, 2010, entitled "Proprietary

Information and Materials Protection Agreement."

19.     Parenthetically, since October 2018, National Lumber's president is attempting to

distance National Lumber from the Proprietary Information and Materials Protection

Agreement, implying that the signatory to that agreement on behalf of National Lumber,

Bill Walker, had no authority to do so.

20.     Since Boise Cascade licensed the FloorLoc intellectual property and provided

such intellectual property to National Lumber in an exclusive agreement so that National

Lumber could be the only supplier of the proprietary US patented pre applied adhesive

FloorLoc system, National Lumber has been expanding its presence with and beyond the

New England States.

## Evolution of the Relationship Between Boise and IPD and PAS

21.     As early as April 5, 2011, in an email to Glenn Robell, Tom Corrick (then the

Vice-President of Boise Cascade, now the CEO and President of Boise Cascade), wrote,

"I understand that you are not interested in modifying the existing agreement between

Boise Cascade and yourself [IPD].  I'm fine with that other than we need to make sure

that National Lumber has an economic way to run their equipment after agreement

expires. What are your ideas about how we do that?"

22.     Subsequently, on or about May 21, 2012, IPD and Boise Cascade entered into an

Exclusive Use Agreement with IPD, which superseded the Patent License Agreement.

19.     As the Exclusive Use Agreement makes clear in its preamble, the subject matter

in part was "certain proprietary intellectual property including but not limited to

inventions protected by U.S. patents and pending U.S. patent applications including a

U.S. patent application having the following Serial Number 11/640/020, U.S. Trademarks

including FloorLoc®, proprietary formula adhesives and release liners, and proprietary

application equipment designs for using the FloorLoc® Pre-Applied Adhesive System on

construction materials including Engineered Wood Products ("EWP") and solid sawn

lumber (collectively, "IPD Intellectual Property").

23.    At or around this time Boise exploited National Lumber's interest in the System

to re-sign an extended exclusive deal with National Lumber to sell the BC engineered

wood product ("EWP") exclusively.

24.    Pursuant to par. 4.5 of the Exclusive Use Agreement, "In the event the Agreement

is terminated prior to the expiration of the Term under Sections 4.2 or 4.4, so long as Boise

Cascade or the National Lumber Site continues to pay IPD the payments specified in 3.1

above until January 1, 2017, IPD shall continue to allow the National Lumber Site to sell, use

and/or license the Existing Equipment until January 1, 2017. Otherwise, the National Lumber

Site will negotiate with IPD directly relating to the continued use and/or license of IPD

Intellectual Property."

25.    A series of emails exchanged between Glenn Robell, Tom Corrick and agents,

employees, officers and/or directors of National Lumber reiterate that when Boise Cascade

is finished with National Lumber deal, National Lumber will need to negotiate with IPD

to continue to produce the product Boise licensed from IPD and then sub- licensed to

National Lumber.

26.    Thereafter, each month Boise Cascade paid IPD, initially $5,000.00 a month in

2012, then $8,333.34 monthly per paragraph 3.1 of the Agreement, on behalf of National

Lumber.

27.    In an email dated November 23, 2015 from Manny Pina, President of National

Lumber to Glenn Robell from IPD, it was stated that "I am in the middle of negotiations

with Boise that should be great for both of us I'm hoping to put in a machine in CT in the

first quarter of 2016 and we should be expanding in other parts of the country soon, stay

tune, Thanks."

28.     Certainly by December 2015, Boise Cascade expressed a willingness to maintain

the agreement with IPD for an additional seven years at the same monthly payment

amount, with National Lumber allowed to expand into one neighboring market.

29.     Indeed, Duke Janturno (in email correspondence involving the Defendants his

surname is spelled "Janturno" and Jantorno;" For consistency, "Janturno" will be used in

this complaint)  from Boise Cascade confirmed in an email to Manny Pina, President of

National Lumber, Bernie Nugent, Vice-President of Trask, and Mark Johnson from Boise

Cascade, dated January 5, 2016 at 4:11:42 p.m., that it had extended to Glenn Robell "an

offer of $100,000 per year to keep the program going as is."

### Boise Cascade and National Lumber Appropriate Intellectual Property

30.     Unilaterally, by February 2016, Boise Cascade had lowered its offer to

$50,000.00 a year "allowing National Lumber to be an exclusive FloorLoc licensee."

On or about February 1, 2016, Boise Cascade's counsel sent a letter to Attorney Dorothy

Morse, IPD's patent counsel, in which he expressed on behalf of Boise Cascade that it

"hopes that National Lumber's contractual relationship with Mr. Robell and his company,

IPD will be extended to the mutual benefit of all three companies.  As an inducement to

Mr. Robell and IPD to extend this relationship, Boise Cascade would pay IPD $50,000

per year for eight years for allowing National Lumber to be an exclusive FloorLoc

licensee, but only if National Lumber uses the FloorLoc process on only Boise Cascade

EWP."

31.     Meaningful negotiations between all parties froze in light of Boise Cascade's

unusual and insincere negotiating tactic of offering IPD one-half of Boise Cascade's

recent offer, and one-half of what Boise Cascade had been paying IPD and would pay IPD until January 1, 2017.

32.    More importantly, on or before this time, Boise Cascade, National Lumber and Trask began to actively conspire against the Plaintiff to deprive it of payment for the FloorLoc system, which included but not limited to soliciting and lining up new adhesive and liner suppliers, converting FloorLoc into a self-branded Rapid Frame property and advertising and/or enabling advertising that held out FloorLoc as their property to the public.

33.    Upon information and belief, Boise Cascade funded the purchase of the machine in whole or in part and continues to benefit from its use as part of the FloorLoc system.

34.    On October 6, 2016, a representative of Boise Cascade purportedly provided written notice of termination of the Exclusive Use Agreement to Glenn Robell pursuant to par. 4.1 of its terms. Again, it is noteworthy that pursuant to par. 4.5 of the Exclusive Use Agreement, "In the event the Agreement is terminated prior to the expiration of the Term under Sections 4.2 or 4.4, so long as Boise Cascade or the National Lumber Site continues to pay IPD the payments specified in 3.1 above until January 1, 2017, IPD shall continue to allow the National Lumber Site to sell, use and/or license the Existing Equipment until January 1, 2017. Otherwise, the National Lumber Site will negotiate with IPD directly relating to the continued use and/or license of IPD Intellectual Property."

35.    Glenn Robell was informed from a number of sources that National Lumber was attempting to purchase FloorLoc supplies from other suppliers and/or develop other

supplies infringing on the patent. This reflects National Lumber's attempt to do so as early as May 2016.

Continued Use and Appropriation of FloorLoc by Boise Cascade

36.    With the acquisition of the Oxford Lumber in Connecticut, that National Lumber purchased after they were highly successful with the Floorloc product, National Lumber's president, Manny Pina, requested a quote for another gluing machine for Connecticut shortly after the Connecticut acquisition was final.

37.    National Lumber's president, Manny Pina, and its Manager of Engineered Wood Design, Bill Walker, showed high interest in being the only possible supplier of Floorloc through Connecticut.

38.    National Lumber decided to move to a double shift in Massachusetts to produce more Floorloc running almost 20 hours per day. Rick Cirino was the main staffing manager of this shift which was instituted to produce more FloorLoc. This was directly tied to the success and expansion plan of the FloorLoc intellectual property.

39.    Boise Cascade and National Lumber provide added value to the builders' EWP package and this is displayed throughout their website; however the only Proprietary portion of the NL added value is the FloorLoc System and its patented technology. Builders can go elsewhere to get the PET precision end trimming of the joist as all large EWP suppliers are offering this as well, therefore FloorLoc is a large part of the potential growth of National Lumber because there is no other supplier where builders can purchase the Pre Applied Adhesive FloorLoc System now being offered exclusively as in its alter ego, "Rapid Frame."

40.    National Lumber continues to market and sell IPD's FloorLoc technology as can be seen by their using the same advertisements as before, only removing IPD's trademark.   Since January 1, 2017, neither PAS nor IPD have received payments from National Lumber though it continues to utilize PAS's intellectual property, holding it out as its own, and selling it without remunerating IPD.

41.    National Lumber is the exclusive distributor of EWP of Boise Cascade in several states and within the context of this relationship, Boise Cascade is actively supporting National Lumber not simply in the traditional manner that it has, but by allowing National Lumber to falsely state in its literature that together with Boise Cascade, it has developed a Rapid Frame technology which is simply a conversion of Floor Loc.  Yet even if the literature is refined and is not so sloppy, it does not change the situation that National Lumber has created and fostered for IPD, and in a separate vein, Boise Cascade and Trask.

42    Traditionally, National Lumber stated on its website until late January 2017, that "National Lumber worked with Boise Cascade to develop the FLOOR LOC process right here in our own manufacturing facility.   This is the next cost efficient step in the improvement of the framing process."

43.    This statement was removed from National Lumber's website after communications were exchanged between Attorney Robert Burns and Boise's counsel, Attorney Joseph Jakubek.   Boise Cascade then contacted National Lumber and almost immediately National Lumber took down the objectionable material from its site, yet Boise Cascade and Trask retained a usufructuary interest (recognizable only in Italian law) in Plaintiff's FloorLoc system.

44. Since January 1, 2017 to the present day and continuing, Boise Cascade profits from the added value of the FloorLoc system without paying the Plaintiff for it, as does its cohorts, National Lumber and Trask.

45.    On its website, National Lumber states that "Pre-applied sub-floor adhesive is the next cost efficient step in improving the framing process. National Lumber invested in the specialized equipment, training, and refinement of the process for pre-applying adhesive in our own manufacturing facility. Here at National Lumber, we'll apply each I-joist with subfloor adhesive under the controlled environment of our production facility. A protective liner is then applied that covers the adhesive to protect it during shipment and from nature's elements. Our process provides consistent application of the subfloor adhesive and the protective liner is simply peeled up and taken away. This is not only faster, it's more efficient than applying adhesive on the jobsite, and it's a safer process for your framing crew. In addition, the sub-floor adhesive in the Rapid Frame System remains flexible, reducing unwanted noise transfer."

46.    The quote used by National Lumber on its website until January 17, 2017, stated that "National Lumber worked with Boise Cascade to develop the FLOOR LOC process right here in our own manufacturing facility. This is the next cost efficient step in the improvement of the framing process," is a nearly identical quote to what is currently on National Lumber's Press Kit, to wit, "National Lumber worked with Boise Cascade to develop a pre-applied adhesive process in their own manufacturing facility. This is the next cost-efficient step in the improvement of the framing process."

47    Well into 2018, when "Boise Cascade Massachusetts" was googled, one of the sites the searcher is directed to a site.

48.     When the searcher clicks on that site, the searcher was directed to a National Lumber site which breaks down Boise Cascade Engineered Wood Products.

49.     When the searcher further clicks the entry for "Engineered Wood Products Division," the searcher is directed to another National Lumber page, which states without limitation that "National Lumber also features a full range of <u>Boise Cascade Engineered Wood Products</u> and in another part of the page cites the "Rapid Frame" system that national Lumber and Boise Cascade have taken from IPD and/or PAS.

50.     There are two significant changes: (1) National Lumber has now substituted "a pre-applied adhesive process" for "the FLOOR LOC process," and (2) has substituted "their own facility" for "our own manufacturing facility," the second change of course, shifting the responsibility and tortious, contractual and/or equitable liability to Boise Cascade.

51.     In an old National Lumber site entry which clearly boasts about their use of Plaintiff's FloorLoc, there was then inserted the National Lumber site entry that boasts about their converted (from IPD) "Rapid Frame" system, with identical testimonials from the same client named Brookes and Hill Custom Builders, per its president David Brookes.

50.     RAPID FRAME® is FloorLoc®.

51.     Craftily, Boise Cascade is continuing to profit from the Plaintiff's FloorLoc system while misrepresenting that it does not do so.  Without limitation:

     a.     as stated earlier, as the exclusive partner and supplier of EWP to National Lumber, Boise Cascade, like Trask, benefits for every lineal foot of I joist sales National Lumber can sell, and

     b.     when Boise Cascade invested tech fund in the initial FloorLoc System and then paid for all the Start Up costs, it was clear to them their investment

would be returned in the rebate program structured with National Lumber at the time.

52.    Currently, National Lumber is stating in its Press Kit under the heading RAPID FRAME® on page 10 that "National Lumber worked with Boise Cascade to develop a pre-applied adhesive process in their own manufacturing facility. This is the next cost-efficient step in the improvement of the framing process. The equipment provides consistent application of the sub-floor adhesive and the protective liner is simply peeled up and taken away. This is not only faster; it is a safer process for your framing crew. The sub-floor adhesive also remains flexible, reducing unwanted noise transfer. National Lumber's trademarked RAPID FRAME® Engineered Floor Systems help builders increase profits by saving time and money with inkjet labeling of precision end trimmed I-joists, pre-cut holes, pre-applied sub-floor adhesive and insulated rimboard." http://www.national-lumber.com/pdf/national-lumber-media-kit-overview.pdf.  Although Boise Cascade has been warned and made aware of this misrepresentation, this statement has not been retracted or removed.

53.    A document entitled "FLOORLOC PROPOSAL" from the opening paragraphs proves that "Boise Cascade's agreement with National Lumber continues through 2016. Charge no royalty through the end of the contract.  Negotiate royalty in new agreement." This is stated by Neill O'Quinn who is the New Product Development Coordinator for President Tom Corrick at Boise Cascade.

Even After Litigation Commenced Against National Lumber, Boise Cascade and
Trask Refused to Rectify the Situation and Continue to Collude with National Lumber

54.    In the IPD/PAS action against the National Lumber in this the Commonwealth of Massachusetts Bristol Superior Court, National Lumber repeatedly represented  that there

were no contracts between National Lumber and Boise Cascade other than voluminous

records such as work orders or invoices, which Plaintiffs did not want and did not

request; in Boise Cascade's partial response to the Rule 30(b)(6) subpoena served on it in

the IPD/PAS action, its counsel sent some documents to the Plaintiff, one of which

proves otherwise, to wit a contract between Boise Cascade and National Lumber.

55.    Not only did this contract exist, but it demonstrated that there was a second

contract between National Lumber and Boise Cascade from 2012, which National

Lumber then produced, once it became evident that there had to have been this earlier

contract after Boise Cascade apparently produced the other contract by mistake.

56.    In the earliest agreement between Boise Cascade and National Lumber, it is clear

that FloorLoc technology played a central role in the relationship between Boise Cascade

and National Lumber (and by logical extension, Trask), as FloorLoc takes up

considerable space on the second page of this two-page agreement.

57.    In its 30(b)(6) response, Central Valley Builders Supply ("CVBS") unlike Boise

Cascade and Trask, fully cooperated in responding to the subpoena, and in part of their

response, they produced many emails from National Lumber agents expressing a personal

hostility toward Glenn Robell, but more importantly, the following email exchanges took

place between CVBS and National Lumber:

**Paul Kinser**

General Manager Woodland & American Canyon

**Central Valley**

530-309-3152

530-681-3135 (Mobile)

**CCentral Valley**

**Attached Message**

| From | Michael McDole <mmcdole@national-lumber.com> |
| --- | --- |
| To | Steve Patterson <StevePat@Central-Valley.com> |
| Cc | Greg Brooks (greg@cs24.us) <greg@cs24.us> |
| Subject | Pre-Applied Adhesive on EWP Floor System |
| Date | Wed, 2 Oct 2013 17:53:48 +0000 |

Hi Steve,

I assume you and Amparo made it home okay. As usual, I enjoyed catching up with you. It's always a good learning experience and a great time at the ECCS Conference. Per one of our conversations, attached is the contact info for the person responsible for the pre-applied adhesive we use on Engineered Wood Floor Systems. If you'd like to learn a little bit more about our system, you can click-on http://www.national-lumber.com/engineering/index.htm <http://www.national-lumber.com/engineering/index.htm> , as we have a video of the "Floor-Loc" process along with other information regarding our PET (Precision End Trimmed) Floor System.

Good luck and let me now if there is anything else I may do for you.

Take Care,

Mike

P.S. We look forward to Napa Valley next year!

Michael McDole | Senior Vice President of Sales
National Lumber | 90 Norfolk St., Mansfield MA 02048
P: (508)339-8020 ext: 4215 | C: (508)962-3316 | F: (508)339-4518
The National Lumber Family of Companies
National Lumber | Reliable Truss | Kitchen Views | National Millwork | Pro Insulators

This electronic communication may contain information that is privileged, CONFIDENTIAL and exempt from disclosure under applicable law. If you are not the intended recipient, please notify me immediately, as the use of this information is strictly prohibited

From: Bill Walker
Sent: Tuesday, October 01, 2013 4:59 PM
To: Michael McDole
Subject: RE: Floor-Loc

Mike

I got your vm. I've attached Glenn Robell's contact info, he's the guy who invented it and is in charge of sales. Let me know if you have any other questions.

Bill

Bill Walker | Manager of Engineered Wood Design
National Lumber | 65 Maple St, Mansfield, MA 02048
P: (508)339-8020 ext: 5667 | C: (508)326-3133 | F: (508)339-4518
The National Lumber Family of Companies

58. These exchanges of emails indicate, without limitation the following:

    a. internally, National Lumber recognizes that Glenn Robell, President of IPD, invented the FloorLoc process;

    b. National Lumber acknowledges to CVBS that Glenn Robell is the "person responsible for the pre-applied adhesive it uses on Engineered Wood Floor Systems, and

    c. rebuts its own subsequent assertion that the Floor Loc process is only a machine.

## The Role of Trask in the Conspiracy

59.    As the wholesaler, between Boise Cascade and National Lumber, Trask intruded because Trask decided that it had a considerable financial stake in enabling, encouraging and ensuring that National Lumber converts the FloorLoc system.

60.    Though Trask rarely if ever dealt directly with Robell, Trask's agents played no less of a pernicious role in colluding, as it actively joined with Boise Cascade and National Lumber to harm the companies of which Robell served as president.

61.    Trask's Vice-President, Bernie Nugent, directly participated in the scheme by Boise Cascade and National Lumber to convert the Floor-Loc system, all the while profiting with Boise Cascade and National Lumber in the unauthorized use of Floor-Loc, without paying for same. In one of the critical emails during which this scheme was spawned, Trask's President, Vincent Micale, was copied in on an email.

## Obstruction of Justice by Trask

62.    On or about March 30, 2018, a Rule 30(b)(6) subpoena was mailed to the Bristol County Deputy Sheriffs, who served Trask with a copy of same.

63.    Initially, Richard A. Skerry, Jr., Trask's in-house counsel, corporate secretary, and since the critical February, 2016 time period, registered agent, expressed a willingness to comply with the subpoena, but in reality, Trask deliberately obstructed complying with the subpoena.

64.    For several weeks, Attorney Skerry represented that Trask only had one page of a contract that might be responsive to the *duces tecum* portion of the subpoena, and promised to send it immediately, though he never did after several requests for even that scrap of paper to be emailed or mailed.  Nevertheless, as late as May 10, 2018, it was believed that Trask was cooperating.

65.    On May 11, 2018, Attorney Skerry unilaterally canceled the projected May 14, 2018 date of deposition for Trask.

66.    After Attorney Skerry refused to have Trask send a Rule 30(b)(6) witness deposition or produce any documents, a Motion to Compel was served on Trask.

67.    On or about July 5, 2018, Trask did serve a response to the Rule 30(b)(6) subpoena and produced some documents, though not all of the documents within its custody and control which were requested of it in the Rule 30(b)(6) subpoena.

69.    In its incomplete document response, Trask did produce and email in which its Vice-President, Bernie Nugent, participated, with notices also to Manny Pina from National Lumber, Duke Janturno from Boise Cascade, Mark Johnson from Boise Cascade and Vincent Micale, the President of Trask.

70.    In this email, dated February 2, 2016, Bernie Nugent stated, "I am writing this email in an effort to get a general understanding of where we are at with the Floor-Loc system and what we need to do to proceed with getting this program put together.  There

is a lot of confusion among us as to where we are and how we got here. I have had many

discussions with everyone copied here but have nothing in writing to build on so this is

an attempt to do so." He then bullet-pointed several statements and asked several

questions.

71.     In an email dated February 3, 2016 at 7:54:09 p.m., Duke Janturno from Boise

Cascade wrote an email to Manny Pina from National Lumber, copied to Bernie Nugent

from Trask and Dennis Huston and Mark Johnson from Boise Cascade, in which he said

in relevant part that, "As you know, we have come to an impasse with Mr. Robell. I

believe that we have exhausted every reasonable effort with this. With that said, I think it

would be prudent to seek the advice of a patent attorney to determine your rights with

your existing machine. Below are two Boston area attorneys recommended to us from

our outside council (sic): unfortunately, he cannot represent you because of conflict of

interest. My understanding is that the cost of retaining council (sic) is approximately

$10,000. We are proposed to support that."

72.     Trask did not produce an email from Duke Janturno from Boise Cascade dated

January 5, 2016 at 4:11:43 p.m., but once National Lumber finally produced emails on

December 13, 2018 (requested of it originally on September 11, 2017, and compelled to

produce by this Court in October 2018); there was this additional email from Janturno to

Bernie Nugent and Manny Pina and Mark Johnson that stated, "Glenn declined our offer

of $100,000 per year to keep the program going as is. We have a call with our in-house

attorneys and outside patent lawyer on Thursday."

73.     Although Boise Cascade had extended an offer to IPD to continue its arrangement

with IPD at the rate of $100,000.00 per year and never believed there was any patent

issue, it now demonstrated a willingness to find someone who would participate in
concocting a patent issue that never existed and which the agents, employees, officers
and directors of Boise Cascade, Trask and National Lumber know does not exist.

74.     Cynically, as had been demonstrated, Boise Cascade's counsel sent the now
notorious letter dated February 1, 2016, to Glenn Robell's counsel, Dorothy Morse, Esq.,
in which the offer was lowered to $50,000.00 per year for Floor-Loc. And Boise Cascade
reiterated that Glenn's company(ies) had a continuing contractual relationship with
National Lumber, stating that Boise Cascade "hopes that National Lumber's contractual
relationship with Mr. Robell and his company, IPD will be extended to the mutual benefit
of all three companies. As an inducement to Mr. Robell and IPD to extend this
relationship, Boise Cascade would pay IPD $50,000 per year for eight years for allowing
National Lumber to be an exclusive FloorLoc licensee, but only if National Lumber uses
the FloorLoc process on only Boise Cascade EWP."

75.     It is inconceivable that Boise Cascade, National Lumber and/or Trask were
negotiating with Glenn Robell in anything but cynical and coordinated bad faith,
particularly since if Boise Cascade's offer for $100,000.00 a year was rejected, it strains
credulity that its $50,000.00 "offer" would be accepted and they had already began to
seek out someone who would back their bogus patent defense.

### .Obstruction of Justice by Boise Cascade

76.     Boise Cascade itself continued to harm Plaintiff, engaging in its own obstruction
of justice. In reply to the 30(b)(6) subpoena on it, it decided to produce only documents
it wanted to produce.

77.     Later, it claimed through counsel that it had produced all of the emails that were responsive to the *duces tecum* in the 30(b)(6) subpoena but this was and is false, since National Lumber has produced, after being compelled to do so by this Court, additional documentation that Boise Cascade possessed and wrongfully withheld.

78.     On August 20, 2018 at 9:38 a.m., Boise Cascade's counsel stated that "Boise Cascade conducted a good faith search for non-privileged, non-work product emails with National Lumber that discuss "FloorLoc," and we did not find any emails. We also discussed the motion to compel against Boise Cascade that you served earlier this week. You agreed not to pursue that motion to compel at this time. **Please confirm by email that your clients will not pursue the motion to compel at this time and that there is no need for Boise Cascade to respond.** Emphasis supplied by Boise Cascade's counsel.

79.     Boise Cascade did have further emails and deliberately decided to not produce them. Again, after National Lumber finally produced additional emails after being ordered to do so by the Bristol Superior Court in the IPD/PAS action, it came to light that critical emails were withheld by Boise Cascade.

80.     By way of the most obvious and egregious example, Boise Cascade failed to turn over an email from Bernie Nugent dated on December 15, 2015 to Manny Pina, Mark Johnson and Duke Janturno in which Trask hoped that "we can get together to structure a deal to retain National Lumber as a Boise EWP customer through Warren Trask," and in which Nugent states, "hopefully the Floor-Loc scare is behind us."

81.     Again, Boise Cascade knew of an email dated February 3, 2016 at 7:54:09 p.m., in which their own Duke Janturno wrote an email to Trask and National Lumber that, "As you know, we have come to an impasse with Mr. Robell. I believe that we have exhausted every

reasonable effort with this. With that said, I think it would be prudent to seek the advice of a patent attorney to determine your rights with your existing machine. Below are two Boston area attorneys recommended to us from our outside council (sic): unfortunately, he cannot represent you because of conflict of interest. My understanding is that the cost of retaining council (sic) is approximately $10,000. We are prepared to support that."

82.    It is difficult to infer what potential conflict of interest nagged Mr. Janturno or how this concerned him in the least, as Boise Cascade and National Lumber have coordinated the defense of the IPD/PAS action as if they were the same entity.

83.    But this risks burying the lead. Long before the contract between IPD and Boise Cascade terminated on January 1, 2017, Boise Cascade expressly supported National Lumber in cheating IPD and/or PAS out of moneys due to them, with full knowledge, consent and participation of Boise Cascade, National Lumber and Trask.

<u>Obstruction of Justice by National Lumber</u>

84.    The obstruction of justice by National Lumber has passed beyond the realm of being a cliché, most recently exhibited by the testimony of its President, Manny Pina, in a deposition dated October 15, 2018; in part Mr. Pina testified that he had only seen the 2010 Proprietary Information and Materials Protection Agreement between National Lumber and PAS, after the IPD/PAS lawsuit commenced in September 2017. Mr. Pina then relates a conversation he allegedly had with Bill Walker, inquiring about why Walker signed the Proprietary Information and Materials Protection Agreement; upon information and belief, this conversation never occurred.    Indeed, in responding to Requests for Admissions No. 30, "...National Lumber admits so much of the request that

alleges National Lumber signed the agreement attached as Exhibit E [the Proprietary Information and Materials Protection Agreement]…"

85.    Not only is Mr. Pina's testimony about this agreement misleading, it is also inaccurate for him to state that he only became aware of its existence on or after the commencement of the IPD/PAS action in September 2017.  In fact, Mr. Pina saw the Proprietary Information and Materials Protection Agreement before the IPD/PAS action commenced in September 2017:

    a. In an email from Bernie Nugent to Manny Pina dated February 2, 2016, Mr. Nugent attaches the PAS/National Lumber Proprietary Information and Materials Protection Agreement, and states, "National Lumber has a (sic) agreement with the Pre-Applied Materials (sic) Inc agreeing to market under Floor-Loc and purchase the machinery, support and materials from them.  There is no mention of a specific term of the contract or any mention of Boise in the agreement."

    b.    Mr. Nugent later asks, "Is the attached agreement the only contract between Pre-Applied Materials (sic) Inc. and National Lumber?"

    c.    On that same date Glenn Robell wrote a separate email to Mr. Pina stating that "the proprietary supplies agreement you were referring to in our conversations today is not from the same company that owns the Floorloc IP rights [i.e., IPD] and granted such rights to BC for the FloorLoc Technology which in turn was granted to NL by BC… ."

    d.    In an email from Glenn Robell to Manny Pina on November 19, 2015 at 10:27 a.m., it is clearly stated to Mr. Pina that National Lumber

"ordered an application system from Pre Applied Systems to manufacture Floorloc onto the BCI joist manufactured only by Boise Cascade. Pre Applied Systems provided that system to NL under the conditions defined in the one page 'Proprietary Materials Agreement' signed by National Lumber."

86.  In his October deposition, Mr. Pina also stated that National Lumber also had another gluing machine, like the one it purchased from PAS in 2010 (with most or all reimbursement for same from Boise Cascade) for a few months at its facility in Branford Connecticut; yet when asked how much he purchased if for, he was vague beyond stating it was for more than $100,000.00.

87.  When asked from whom National Lumber purchased this gluing machine, which is currently in National Lumber's facility in Branford Connecticut, Mr. Pina did not know the name of the company from which he purchased the machine or the name of one person to whom he spoke about the machine.

88.  This is not credible testimony.  Mr. Pina, by his own admission, was the only person who could authorize the purchase of the gluing machine, yet refused to provide full and truthful answers to this line of questioning, particularly relevant because he apparently purchased for the Branford, Connecticut facility, a machine which was designed by Glenn Robell.

89.  While it strains credulity that Mr. Pina could testify ignorance of the particulars of the purchase of the second gluing machine, the excuse proffered by National Lumber's outside counsel that Mr. Pina addresses large transactions all the time and cannot be expected to remember the details of all of them, is nonsense.

90.    Indeed, National Lumber's in-house counsel was in attendance at Mr. Pina's deposition and indeed at another juncture in his deposition Mr. Pina used his cell phone to ascertain dates during which he met Boise Cascade representatives in Texas.  Even after taking a break, Mr. Pina did not attempt to answer this line of questioning.

91.    These are but two examples of the stonewalling of President Pina during his deposition, as in general, he professed to not know several facts that he knew or should have known.

92.    The recent obstruction of justice by Mr. Pina and National Lumber simply is a continuation of National Lumber's obstruction displayed since the advent of the IPD/PAS action, when the complaint against National Lumber with interrogatories and requests for production of documents was first served upon it on September 11, 2017.

93.    In its original opposition to the TRO application in the IPD/PAS action, National Lumber trotted out the Affidavit of Bill Walker dated September 18, 2017.

94.    In paragraph 3 of his affidavit, Bill Walker, audaciously states that "as it pertains to the [gluing] machine in question, National Lumber did not enter into any contract with Boise Cascade," disproven when IPD finally received contract(s) between National Lumber and Boise Cascade.

95.    In paragraph 8 of his affidavit, Bill Walker stated "the glue and release tape in question, even when purchased from Glenn Robell's company, did not originate with Glenn Robell" when in fact they did..

96.    In the first hearing in the IPD/PAS action, for a TRO/preliminary injunction, National Lumber defeated the allowance of this motion in large part by mischaracterizing its liability to IPD/PAS.  Thereafter, National Lumber obstructed discovery.

97.    On or about March 23, 2018, the hearing on Plaintiffs' Motion to Compel

Responses to Requests for Production was held.

98.    A number of statements came out of this hearing, including the fact that National

Lumber had not catalogued two bankers boxes of what proved were irrelevant

documents.

99.    So as of March 23, 2018, apparently no one knew what National Lumber had

produced in the two bankers boxes and the contents were not catalogued.  The defense

then raised the entirely inaccurate position that the request was overly broad (because that

had been dealt with repeatedly already. and the request never asked for invoices which

again might be merely some evidence of an existence of a contract.

100.    National Lumber trotted out another excuse, that IPD and/or PAS were seeking

sub-licensing contracts which "doesn't exist."  This is simply another invalid excuse from

National Lumber for stonewalling discovery, along with Plaintiff wanting too much (they

did not; they had already received a box of largely worthless paperwork) or irrelevant

pricing information.

101.    Before National Lumber went to all the effort to produce things that IPD and

PAS already told them Plaintiffs did not want Judge Pasquale then fleshed out what

Plaintiffs were seeking, which were actual contracts.

102.    If there were no contracts between National Lumber and Boise Cascade, then why

were two contracts finally produced?  National Lumber cannot have it both ways, arguing

that IPD and PAS's request was too broad when that red herring had been cleared up very

early in this action, and that when asked for a very narrow thing (and not so narrow as

requesting only sub-licensing agreements), it took nine months to produce.

103.   That said, on March 23 the hearing continues to a discussion about receiving documents in a 30(b)(6) deposition, and IPD/PAS then issued 30(b)(6) subpoenas primarily to receive documents that National Lumber was deliberately withholding; a deposition that Boise Cascade did not attend and then requested its fees for on May 18, 2018.

104.   National Lumber's carrier, Evanston Insurance Company, has been put on notice concerning many of the objected to discovery practices of National Lumber.

105.   As late as summer 2018, in the hearing on the motion for fees in the IPD/PAS action, one of its counsel stated that National Lumber had produced all of its emails.

106.   National Lumber finally served a full written response and at least a partially complete document response concerning the request for emails between National Lumber and Boise Cascade, on or about December 13, 2018 (having been served with the requests originally on September 11, 2018 by sheriff), after an order from this Court on the motion for fees in October 2018, which compelled the production of emails in the IPD/PAS action.

107.   National Lumber itself has averred positions that were not plausible and has since abandoned them once they were exposed to be untrue and made no sense: without limitation, (1)  the only claim that IPD and/or PAS had against National Lumber was for the sale of a machine that National Lumber long since paid for, (2)  IPD and/or PAS cut off supplies to National Lumber before December 31, 2016, which certainly was untrue and known to be untrue by National Lumber when it trotted out this excuse for its breach and other tortious behavior, (3)  National Lumber had to reach outside of the Commonwealth to hire someone, anyone to misstate the status of IPD and/or PAS's ongoing patent(s).

108.   In the Responses to Requests for Admissions in the IPD/PAS action, Mr. Walker,
the same individual who supposedly executed an agreement with PAS in 2010 that
President Pina did not know about, until after litigation commenced, could not respond
because "its engineered wood products" was "confusing and not understood," even
though he is or was the Manager of Wood Design at National Lumber.  He also was
allegedly baffled by the terms "Intellectual Property," "IPD's pre-applied adhesive
system," "PAS Proprietary Pre-Applied Adhesive FloorLoc® System," "PAS Proprietary
Information and Materials," "FloorLoc liners," "The Floor:Loc System," "entered into an
agreement," "all applicable dates" and "a continuation for the patent."

109.   These are merely a sampling of the non-answers and/or deliberate evasions by
Mr. Walker in the Responses to Requests for Admissions.  When this was pointed out in
a brief and oral argument in Court in the IPD/PAS action, National Lumber's counsel
magnanimously stated that if IPD/PAS did not like the responses, it should file a motion
to compel; which National Lumber's counsel should have known is no longer a remedy
available in the Commonwealth of Massachusetts during the pendency of a civil action.

COUNT I-CIVIL CONSPIRACY/COLLUSION AGAINST BOISE CASCADE

110.   The Plaintiff repeats and realleges the allegations made in paragraphs 1-109
herein.

110.   Boise Cascade, Trask and National Lumber have colluded and have engaged in a
civil conspiracy with each other to prevent IPD from receiving moneys due to it and has
been actively engaged in obstructing justice with National Lumber in its action brought
by IPD in this jurisdiction in the IPD/PAS action.

111.    Without limitation, Boise Cascade has refused to honor a Rule 30(b)(6) deposition subpoena served on it, choosing instead to fire off a 21 page letter with limited documents, then refusing to negotiate in good faith any terms for holding the deposition.

112.    Without limitation, Boise Cascade has continued to serve as National Lumber's EWP source, knowing full well and approving of National Lumber's continued use of IPD and/or PAS's intellectual property and false advertising to their mutual benefit and harm to IPD and PAS.

113.    Without limitation, Boise Cascade has represented that it delivered all emails responsive to the Rule 30(b)(6) subpoena when clearly it did not.   In part and in whole, Boise Cascade has harmed IPD.

## COUNT II-CIVIL CONSPIRACY/COLLUSION AGAINST NATIONAL LUMBER

114.    The Plaintiff repeats and realleges the allegations made in paragraphs 1-113 herein.

115.    Boise Cascade, Trask and National Lumber have colluded and have engaged in a civil conspiracy with each other to prevent IPD from receiving moneys due to it and have actively engaged in obstructing justice with National Lumber in its action brought by IPD in this jurisdiction in the IPD/PAS action.

116.    Without limitation, National Lumber has compelled IPD to serve seven Rule 30(b)(6) deposition subpoenas to obtain information that National Lumber knowingly and deliberately failed to produce, and one of its counsel had the gall to raise this in Court as if IPD was the party to blame for issuing the subpoenas.

117.    Without limitation, National Lumber has misrepresented to the Court, by one of its counsel, that there were no agreements between National Lumber and Boise Cascade

when there were two separate agreements between these two companies which National

Lumber knew about and intentionally withheld.

118.    Without limitation, National Lumber, by one of its counsel, misrepresented to the

Court in summer 2018, that it had turned over all of its emails to IPD and/or PAS when

National Lumber knowingly had not done so, as proven by it later producing relevant

emails after a compel order was issued by the Bristol Superior Court.

119.    Without limitation, National Lumber has repeatedly made false and absurd claims

and defenses in the IPD/PAS action, knowing that they were false and misleading and

done solely to mislead the Court and delay the inevitable for National Lumber's theft of

intellectual property.  In its collusion with Trask and Boise Cascade, National Lumber

has caused IPD financial harm.

COUNT III-CIVIL CONSPIRACY/COLLUSION AGAINST TRASK

120.    The Plaintiff repeats and realleges the allegations made in paragraphs 1-119

herein.

121.    Trask, Boise Cascade, Trask and National Lumber have colluded and have

engaged in a civil conspiracy with each other to prevent IPD from receiving moneys due

to it and has been actively engaged in obstructing justice with National Lumber in its

action brought by IPD in the IPD/PAS action.

122.    Trask actively engaged with National Lumber and Boise Cascade to obstruct

justice by knowingly and deliberately, and with the participation of National Lumber and

Boise Cascade and/or its representatives, to withhold evidence after being served with a

Rule 30(b)(6) subpoena.

123.     Without limitation, Trask has refused to honor a Rule 30(b)(6) deposition

subpoena served on it, choosing to unilaterally and with the actions of its secretary and

in-house counsel, Richard Skerry, Esq. to fail to designate a Rule 30(b)(6) designee and

have its designee attend a scheduled May 14, 2018 deposition.

124.     Without limitation, Trask has continued to serve as National Lumber's EWP

wholesaler, knowing full well and approving of National Lumber's continued use of IPD's

intellectual property and National Lumber's deceptive advertising to their mutual benefit

and financial harm to IPD.

125.     Without limitation, Trask's Vice-President Bernie Nugent and its President Vincent

Micale, actively engaged and often initiated meetings designed to deprive IPD of moneys due to

it, intruding in this dispute.

### COUNT IV-UNJUST ENRICHMENT AGAINST BOISE CASCADE

126.     The Plaintiff repeats and realleges the allegations made in paragraphs 1-125

herein.

127.     As a result of the conduct described herein, Boise Cascade has been and will be

unjustly enriched at the expense of IPD.

128.     Specifically, Boise Cascade's unscrupulous acts and practices as described herein

have enabled Boise Cascade to wrongfully manufacture and sell products based on PAS's

intellectual property and use of its equipment and to  IPD's assets and rights to income,

all without paying either PAS or IPD, unjustly enriching Boise Cascade in an amount to

be determined at trial.

129.     Boise Cascade should be required to disgorge this unjust enrichment but has not

done so despite due and repeated demands by IPD.

## COUNT V-UNJUST ENRICHMENT AGAINST TRASK

130.   The Plaintiff repeats and realleges the allegations made in paragraphs 1-129 herein.

131.   As a result of the conduct described herein, Trask has been and will be unjustly enriched at the expense of IPD.

132.   Specifically, Trask's unscrupulous acts and practices as described herein have enabled Trask to profit as a wholesaler from PAS's intellectual property and use of its equipment and to  IPD's assets and rights to income, all without paying either PAS or IPD, unjustly enriching Trask in an amount to be determined at trial.

133.   Trask should be required to disgorge this unjust enrichment but has not done so.

## COUNT VI-QUANTUM MERUIT AGAINST BOISE CASCADE

134.   The Plaintiff IPD repeats and realleges the allegations made in paragraphs 1-133 herein.

135.   Despite the substantial breaches of agreements with PAS and IPD by Boise Cascade, PAS and IPD have either completely or substantially complied with their obligations to Boise Cascade and IPD should be justly compensated for same.

## COUNT VII – RESTRAINT OF TRADE AGAINST BOISE CASCADE

136.   The Plaintiff repeats and realleges the allegations made in paragraphs 1-135 herein.

137.   Since the Boise Cascade's joint venture National Lumber has been represented at hearing and has joined the issues, it has made clear that it will use any means to not pay for the Floor-Loc System for which the Plaintiff(s) has been receiving $100,000.00 a year for the past several years; Boise Cascade has destroyed competition in this area because

no other company will use the FloorLoc System and pay IPD for the rights thereto when the Defendants are wrongfully using said system for free.

138.  Boise Cascade has and will continue to harm IPD by its restraint of trade in violation of G.L. c. 93, s. 4, which has grievously harmed IPD and will continue to do so until Boise Cascade ceases to do so.

139.  Boise Cascade has monopolized or is attempting to monopolize a part of a trade or commence in the Commonwealth, and indeed the country, in violation of G.L. c. 93, s. 5.

140.  Boise Cascade has and will continue to harm IPD by its violations of G.L. c. 93, s. 5, which has grievously harmed the Plaintiff(s) and will continue to do so until Boise Cascade ceases to do so.

141.  Boise Cascade, by misappropriating the FloorLoc system has lessened substantially, if not totally destroyed, competition and created a monopoly in a line of trade or commerce in the Commonwealth in violation of G.L. c. 93, s. 6.

142.  Boise Cascade has and will continue to harm IPD by its violation of G.L. c. 93, s. 6, which has grievously harmed the IPD and will continue to do so until Boise Cascade ceases to do so.

### COUNT VIII – RESTRAINT OF TRADE AGAINST TRASK

143.  The Plaintiff repeats and realleges the allegations made in paragraphs 1-142 herein.

144.  Trask injected themselves in the issues that IPD was having with Boise Cascade and National Lumber since 2015, whether it should have or not. Trask has voluntarily joined with Boise Cascade and National Lumber to destroy competition, particularly in

the East Coast, because no other company will use the FloorLoc System and pay IPD for the rights thereto when Trask is wrongfully profiting from said system for free.

145.    Trask has and will continue to harm IPD by its restraint of trade in violation of G.L. c. 93, s. 4, which has grievously harmed IPD and will continue to do so until Boise Cascade ceases to do so.

146.    Trask has monopolized or is attempting to monopolize a part of a trade or commence in the Commonwealth, and indeed the country, in violation of G.L. c. 93, s. 5. Trask has harmed, and will continue to harm IPD, by Trask's violations of G.L. c. 93, s. 5, which has grievously harmed IPD and will continue to do so until Trask ceases to do so.

147.    Trask, by misappropriating the FloorLoc system and/or participating with Boise Cascade and National Lumber it their efforts to do so, has lessened substantially, if not totally destroyed, competition and created a monopoly in a line of trade or commerce in the Commonwealth in violation of G.L. c. 93, s. 6.

148.    Trask has and will continue to harm IPD by its violation of G.L. c. 93, s. 6, which has grievously harmed the IPD and will continue to do so until Trask ceases to do so.

COUNT IX – INTENTIONAL INTERFERENCE WITH CONTRACT BY TRASK

149.    The Plaintiff repeats and realleges the allegations made in paragraphs 1-148 herein.

150.    Even though it is a wholesaler, Trask dove into the contract and/or advantageous business relations between IPD/PAS and Boise Cascade and the contract between IPD/PAS and National Lumber (as set forth by Boise Cascade's own counsel) and any advantageous relations between IPD/PAS and has caused IPD financial harm thereby.

COUNT X-VIOLATION OF G.L. c. 93A AGAINST BOISE CASCADE

151.   The Plaintiff repeats and realleges the allegations made in paragraphs 1-150 herein.

152.   Boise Cascade is engaged in trade and commerce as a building materials supplier and is incorporated to accomplish this purpose pursuant to G.L. c. 93A, s. 2.

153.   Boise Cascade engaged in unfair and deceptive acts and practices by misleading IPD and by breaching agreements with IPD without cause and by wrongfully appropriating and utilizing intellectual property and equipment and not compensating IPD for its assets or restoring moneys due to IPD; in this vein, Boise Cascade has willfully and knowingly attempted to engage in these prohibited acts and practices, in violation of G.L. c. 93A.

154.   The employment of these acts and practices by Boise Cascade was willful and knowing, entitling IPD to treble its actual damages together with interest, costs and reasonable attorney's fees.

COUNT XI-VIOLATION OF G.L. c. 93A AGAINST TRASK

155.   The Plaintiff repeats and realleges the allegations made in paragraphs 1-154 herein.

156.   Trask is engaged in trade and commerce as a wholesaler of building materials and is incorporated to accomplish this purpose pursuant to G.L. c. 93A, s. 2.

157.   Trask engaged in unfair and deceptive acts and practices by assisting Boise Cascade and National Lumber in their breaching agreements with IPD without cause and in Defendants' wrongful appropriation and utilization of intellectual property and equipment without compensating IPD for its assets or restoring moneys due to IPD;

Trask has willfully and knowingly attempted to engage in these prohibited acts and practices, in violation of G.L. c. 93A.

158.    The employment of these acts and practices by Trask was willful and knowing, entitling IPD to treble its actual damages together with interest, costs and reasonable attorney's fees.

### COUNT XII-VIOLATION OF G.L. c. 176D AGAINST EVANSTON

159.    The Plaintiff repeats and realleges the allegations made in paragraphs 1-158 herein.

160.    On or about July 27, 2018, Plaintiff served Evanston with a demand letter pursuant to G.L. c 93A and G.L. c. 176D.

161.    In that correspondence, it was recounted that on or about September 18, 2017, counsel for National Lumber appeared in Bristol Superior Court in opposition to IPD's request for injunctive relief.

162.    From the outset, National Lumber and Evanston asserted defenses that simply were not accurate, most prominently that the patent that existed for the FloorLoc process at issue had expired.

163.    National Lumber and Evanston also claimed that the entire relationship between my client(s) and National Lumber was based on a machine that National Lumber purchased and supplies it paid for, once the machine was conditionally sold.

164.    PAS and National Lumber signed an agreement in 2010 with restrictions on its use, and National Lumber since January 1, 2017 has violated all of the conditions and is barred from using the machine.  Based in large part on the misrepresentations by National Lumber and Evanston, the request for injunctive relief was denied.

165.   The acts of National Lumber and Evanston have continued since, unabated. assertions have been incorrectly made that National Lumber had to find other suppliers because my client(s) had cut them off from supplies of liners and adhesives in the FloorLoc system and again, this is factually wide of the mark.   In 2016 National Lumber was actively soliciting new suppliers and did not run out of supplies from my client until well into 2017.

166.   Discovery has been deliberately thwarted by National Lumber and Evanston in this action.   Nearly fifteen months elapsed between the time emails between National Lumber and Boise were requested and produced, and only then once the Court ordered them to be produced.

167.   National Lumber and Evanston produced 963 pages of bate-stamped documents in October 2017, most of which were irrelevant and many copied repeatedly, one document at least copied five times.   Illogically, National Lumber and Evanston in its response set up two positions, that the request was too broad and too narrow (unaware of contracts pertaining to the machine).

168.   National Lumber and Evanston denied the existence of contracts between National Lumber and Boise, when in fact such documents existed.

169.   Glenn Robell, was compelled to fly out to Massachusetts and sit for two full days of his deposition, and though nothing positive came out of this for National Lumber and Evanston, this action continues.   Indeed, preposterous issues were raised, such as there was another patented process other than Robell's.

170.   What we are left with is not a defense, but what IPD firmly believes is a gross violation of G.L. c. 176D and by extension G.L. c. 93A by Evanston.   Through your

counsel and agents and insured, statements that bear no relation to the facts have been uttered, repeated and never retracted.

171.    In addition to the c. 176D, s. 2 violation discussed above, Plaintiff believes that Evanston has also violated the following subsections of this statute:

(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

172.    Pursuant to c. 93A, sect. 9(3). Evanston did not remediate its violations, but merely sent a letter back with a nominal offer that had been rejected months earlier.

COUNT XIII-VIOLATION OF G.L. c. 93A AGAINST EVANSTON

173.    The Plaintiff repeats and realleges the allegations made in paragraphs 1-172 herein.

174.    Evanston's multiple violations of G.L. c. 176D individually and collectively Evanston's acts constitute unfair and deceptive acts and practices as set forth and defined in the applicable sections of M.G.L. c. 93A.

175.    Evanston's unfair and deceptive acts and practices were willful and knowing, for which Plaintiff is entitled to treble damages together with interest, costs and reasonable attorneys fees from Evanston.

COUNT XIV-CONVERSION AGAINST ONE
UNNAMED GLUING MACHINE MANUFACTURER

176.    The Plaintiff repeats and realleges the allegations made in paragraphs 1-175 herein.

177.    The unnamed gluing machine manufacturer converted to its own personal use the intellectually property of IPD, PAS and/or Robell to itself to duplicate and/or substantially replicate the gluing machine sold to National Lumber in 2010, without authority or knowledge of IPD, PAS and/or Robell .

178.    The unnamed gluing machine manufacturer never returned to IPD, PAS and/or Robell the property and equipment it converted from IPD, PAS and/or Robell nor has it paid IPD, PAS and/or Robell for its unauthorized use and copying of the gluing machine, and IPD has been grievously injured thereby.

COUNT XV-UNJUST ENRICHMENT AGAINST ONE<br>UNNAMED GLUING MACHINE MANUFACTURER

179.    The Plaintiff repeats and realleges the allegations made in paragraphs 1-178 herein.

180.    As a result of the conduct described herein, the unnamed gluing machine manufacturer has been and will be unjustly enriched at the expense of PAS and IPD.

181.    Specifically, the unnamed gluing machine manufacturer's unscrupulous acts and practices as described herein have enabled it wrongfully manufacture and sell a gluing machine based on PAS's intellectual property and use of its equipment and to  IPD's assets and rights to income, all without paying either PAS or IPD, unjustly enriching it an amount to be determined at trial.

182.    The unnamed gluing machine manufacturer should be required to disgorge this unjust enrichment but has not done so despite knowing that it had copied the intellectual property of other(s).

COUNT XVI-VIOLATION OF G.L. c. 93A AGAINST ONE
UNNAMED GLUING MACHINE MANUFACTURER

183. The Plaintiff repeats and realleges the allegations made in paragraphs 1-182 herein.

184. The unnamed gluing machine manufacturer is engaged in trade and commerce as a machine manufacturer and is either an individual or is incorporated to accomplish this purpose pursuant to G.L. c. 93A, s. 2.

185. The unnamed gluing machine manufacturer engaged in unfair and deceptive acts and practices by duplicating and/or substantially replicating a gluing machine developed by Robell and/or IPD and/or PAS, and by wrongfully appropriating and utilizing intellectual property and equipment of others and not compensating IPD for its assets or restoring moneys due to IPD; the unnamed gluing machine manufacturer has willfully and knowingly attempted to engage in these prohibited acts and practices, in violation of G.L. c. 93A.

186. The employment of these acts and practices by the unnamed gluing machine manufacturer was willful and knowing.

COUNT XVII-CONVERSION AGAINST ONE SUPPLIER OF ADHESIVES

187. The Plaintiff repeats and realleges the allegations made in paragraphs 1-186 herein.

188. The unnamed supplier of adhesives converted to its own personal use the intellectually property of IPD, PAS and/or Robell to itself to duplicate and/or substantially replicate the glue for the FloorLoc process, without authority or knowledge of IPD, PAS and/or Robell .

189.    The unnamed supplier of adhesives never returned to IPD, PAS and/or Robell the property it converted from IPD, PAS and/or Robell nor has it ceased producing the glue and selling it to National Lumber nor has it paid IPD, PAS and/or Robell for its unauthorized use and copying of the glue and IPD has been grievously injured thereby.

### COUNT XVIII-UNJUST ENRICHMENT
### AGAINST ONE SUPPLIER OF ADHESIVES

190.    The Plaintiff repeats and realleges the allegations made in paragraphs 1-189 herein.

191.    As a result of the conduct described herein, unnamed supplier of adhesives has been and will be unjustly enriched at the expense of PAS and IPD.

192.    Specifically, unnamed supplier of adhesives' unscrupulous acts and practices as described herein have enabled it wrongfully produce and sell glue based on PAS's intellectual property and use of its equipment and to IPD's assets and rights to income, all without paying either PAS or IPD, unjustly enriching it an amount to be determined at trial.

193.    The unnamed gluing machine manufacturer should be required to disgorge this unjust enrichment but has not done so despite knowing that it had copied the intellectual property of other(s).

### COUNT XIX-VIOLATION OF G.L. c. 93A
### AGAINST ONE SUPPLIER OF ADHESIVES

194.    The Plaintiff repeats and realleges the allegations made in paragraphs 1-193 herein.

195. The unnamed supplier of adhesives is engaged in trade and commerce as an adhesives producer and seller and is either an individual or is incorporated to accomplish this purpose pursuant to G.L. c. 93A, s. 2.

196. The unnamed supplier of adhesives engaged in unfair and deceptive acts and practices by duplicating and/or substantially replicating a glue developed by Robell and/or IPD and/or PAS, and by wrongfully appropriating and utilizing intellectual property and equipment of others and not compensating IPD for its assets or restoring moneys due to IPD; the unnamed supplier of adhesives has willfully and knowingly attempted to engage in these prohibited acts and practices, in violation of G.L. c. 93A.

197. The employment of these acts and practices by the unnamed supplier of adhesives was willful and knowing.

COUNT XX- CONVERSION AGAINST ONE SUPPLIER OF LINERS

197. The Plaintiff repeats and realleges the allegations made in paragraphs 1-196 herein.

198. The unnamed supplier of liners converted to its own personal use the intellectually property of IPD, PAS and/or Robell to itself to duplicate and/or substantially replicate the liners for the FloorLoc process, without authority or knowledge of IPD, PAS and/or Robell.

199. The unnamed supplier of liners never returned to IPD, PAS and/or Robell the property it converted from IPD, PAS and/or Robell nor has it ceased producing the liners and them to National Lumber nor has it paid IPD, PAS and/or Robell for its unauthorized use and copying of the liners and IPD has been grievously injured thereby.

COUNT XXI-UNJUST ENRICHMENT AGAINST ONE SUPPLIER OF LINERS

200.   The Plaintiff repeats and realleges the allegations made in paragraphs 1-199 herein.

201.   As a result of the conduct described herein, the unnamed gluing machine manufacturer has been and will be unjustly enriched at the expense of PAS and IPD.

202.   Specifically, the unnamed supplier of liners' unscrupulous acts and practices as described herein have enabled it wrongfully manufacture and sell a liners based on PAS's intellectual property and use of its equipment and to IPD's assets and rights to income, all without paying either PAS or IPD, unjustly enriching it an amount to be determined at trial.

203.   The unnamed supplier of liners should be required to disgorge this unjust enrichment but has not done so despite knowing that it had copied the intellectual property of other(s).

COUNT XXII-VIOLATION OF G.L. c. 93A AGAINST ONE SUPPLIER OF LINERS

204.   The Plaintiff repeats and realleges the allegations made in paragraphs 1-203 herein.

205.   The unnamed supplier of liners is engaged in trade and commerce as an adhesives producer and seller and is either an individual or is incorporated to accomplish this purpose pursuant to G.L. c. 93A, s. 2.

206.   The unnamed supplier of liners engaged in unfair and deceptive acts and practices by duplicating and/or substantially replicating a liner developed by Robell and/or IPD and/or PAS, and by wrongfully appropriating and utilizing intellectual property and equipment of others and not compensating IPD for its assets or restoring moneys due to

IPD; the unnamed supplier of liners has willfully and knowingly attempted to engage in these prohibited acts and practices, in violation of G.L. c. 93A.

207.    The employment of these acts and practices by the unnamed supplier of liners was willful and knowing.

WHEREFORE, the Plaintiff IPD, Inc. demands the following relief:

1.    judgment against Defendants in an amount commensurate with damages sustained by IPD, together with interest, costs and attorney's fees,

2.    judgment against Defendants in an amount commensurate with the actual damages to IPD, trebled but in no instance less than doubled, together with interest, costs and attorney's fees, pursuant to G.L. c. 93A,

3.    that Boise Cascade, National Lumber and Trask be restrained from using the FloorLoc System, in the guise of RapidFrame or any other successor name chosen by them, either in sales, wholesaling, manufacturing, advertising and/or retailing any I-joists using the system,

4.    that Boise Cascade, National Lumber and Trask be restrained from selling and transferring any materials, products or services which derive from or benefit from IPD's intellectual property or equipment (and to the extent that he already has done so, restoring to an escrow account all the moneys they have taken possession of in this unauthorized pursuit) alienating and/or hypothecating any these assets and from taking possession of any proceeds if a sale or other prohibited act occurs before the IPD is allowed to have a hearing on his planned motions to prohibit such actions during the pendency of this matter,

5.      that any and all agents, employees, officers and directors of Boise Cascade, National Lumber and Trask be restrained from providing inaccurate and/or incomplete testimony, making baseless claims or proffering knowingly inaccurate defenses and from obstructing discovery requests served no them,

6.      that any and all agents, employees, officers and directors of Boise Cascade, National Lumber and Trask be restrained from colluding and conspiring to deprive IPD moneys due to it and from impeding discovery,

7.      that Boise Cascade, National Lumber and Trask pay into an escrow account or into court minimum monthly royalties formerly due of $100,000.00 a year pro-rated since January 1, 2017 (currently $200,000.00),

8.      that Boise Cascade and National Lumber be restrained from holding out to the public that the IPD's intellectual property and equipment is their own or was developed by one or both of them,

9.      that One Unnamed Gluing Machine Manufacturer, One Supplier of Adhesives and One Supplier of Liners be restrained from using the FloorLoc System, in the guise of RapidFrame or any other successor name chosen by them, either in sales, wholesaling, manufacturing, advertising and/or retailing any I-joists using the system,

10.      that One Unnamed Gluing Machine Manufacturer, One Supplier of Adhesives and One Supplier of Liners be restrained from manufacturing, selling and/or transferring any materials, products or services which derive from or benefit from IPD's intellectual property or equipment (and to the extent that he already has done so, restoring to an escrow account all the moneys they have taken possession of in this unauthorized pursuit) alienating and/or hypothecating any these assets and from taking possession of any

proceeds if a sale or other prohibited act occurs before the IPD is allowed to have a

hearing on his planned motions to prohibit such actions during the pendency of this

matter,

11.     For such other relief as the Court deems meet and just.

THIS COMPLAINT IS PERSONALLY SIGNED BY THE PLAINTIFF UNDER THE PAINS AND
PENALTIES OF PERJURY AND IS TRUE AND ACCURATE TO THE BEST OF HIS PERSONAL
KNOWLEDGE AND INFORMATION.

IPD by its President

Dated: January 10, 2019

Glenn Robell

A TRIAL BY JURY IS CLAIMED FOR ALL ISSUES SO TRIABLE

By its attorney,

Donald Hubbard, Esq.
46 Stratford Street
Boston, MA  02132
617-469-0775
BBO No. 543971
deejhub@aol.com

Dated: January 11, 2019